# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
-----------------------------x
                             :
STEPHANIE EMILY CHESMAR      :    Civ. No. 3:18CV00284(SALM)
                             :
v.                           :
                             :
NANCY A. BERRYHILL,          :    March 18, 2019
ACTING COMMISSIONER, SOCIAL  :
SECURITY ADMINISTRATION      :
                             :
-----------------------------x
```

## <u>RULING ON CROSS MOTIONS</u>

Plaintiff, Stephanie Emily Chesmar, brings this appeal pursuant to §205(g) of the Social Security Act ("the Act"), as amended, seeking review of a final decision by the Acting Commissioner of the Social Security Administration (the "Commissioner") denying her application for Supplemental Security Income ("SSI"). Plaintiff has moved for an order reversing the decision of the Commissioner, or in the alternative, for remand [Doc. #25]. Defendant has filed a motion for an order affirming the decision of the Commissioner [Doc. #29].

For the reasons set forth below, plaintiff's Motion to Reverse or Remand **[Doc. #25]** is **GRANTED**, to the extent that it seeks remand, and defendant's Motion for an Order Affirming the Decision of the Commissioner **[Doc. #29]** is **DENIED.**

I.  **PROCEDURAL HISTORY**[1]

Plaintiff filed an application for SSI on March 11, 2014,[2] alleging disability beginning August 17, 2012. See Certified Transcript of the Administrative Record, Doc. #17 and attachments, compiled on April 14, 2018, (hereinafter "Tr.") at 297-305. Plaintiff's application was denied initially on July 9, 2014, see Tr. 236-240, and upon reconsideration on December 24, 2014, see Tr. 199-209.

On August 11, 2016, plaintiff, represented by Attorney Meryl Anne Spat, appeared and testified before Administrative Law Judge ("ALJ") Bruce H. Zwecker. See Tr. 133-186. Vocational Expert ("VE") Courtney Olds testified at the hearing. See Tr. 180-185. Elizabeth Montagno also testified.[3] See Tr. 161-179. Plaintiff has resided with Ms. Montagno since 2013 when plaintiff's adoptive mother, Ms. Montagno's sister, passed away. See Tr. 161. On September 15, 2016, the ALJ issued an unfavorable decision. See Tr. 21-35. On December 18, 2017, the

---

[1] Plaintiff submitted a statement of material facts with her motion to reverse or remand. See Doc. #25-2. The Commissioner filed a response to that statement, including specific objections and alleged material omissions. See Doc. #29-2.

[2] The ALJ's decision lists the application date as February 24, 2014. See Tr. 21.

[3] Ms. Montagno is referred to as "Aunty Betty" in plaintiff's motion. See Doc. #25-1 at 1.

Appeals Council denied plaintiff's request for review, making the ALJ's September 15, 2016, decision the final decision of the Commissioner. See Tr. 1-7. The case is now ripe for review under 42 U.S.C. §405(g).

## II.  STANDARD OF REVIEW

The review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). Second, the court must decide whether the determination is supported by substantial evidence. See id. Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The reviewing court's responsibility is to ensure that a claim has been fairly evaluated by the ALJ. See Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983).

The Court does not reach the second stage of review – evaluating whether substantial evidence supports the ALJ's conclusion – if the Court determines that the ALJ failed to apply the law correctly. See Norman v. Astrue, 912 F. Supp. 2d 33, 70 (S.D.N.Y. 2012) ("The Court first reviews the Commissioner's decision for compliance with the correct legal

3

standards; only then does it determine whether the
Commissioner's conclusions were supported by substantial
evidence."). "Where there is a reasonable basis for doubt
whether the ALJ applied correct legal principles, application of
the substantial evidence standard to uphold a finding of no
disability creates an unacceptable risk that a claimant will be
deprived of the right to have [his] disability determination
made according to the correct legal principles." Johnson v.
Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

"[T]he crucial factors in any determination must be set
forth with sufficient specificity to enable [a reviewing court]
to decide whether the determination is supported by substantial
evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir.
1984). The ALJ is free to accept or reject the testimony of any
witness, but a "finding that the witness is not credible must
nevertheless be set forth with sufficient specificity to permit
intelligible plenary review of the record." Williams ex rel.
Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988). It is
well established that "an ALJ's credibility determination is
generally entitled to deference on appeal." Selian v. Astrue,
708 F.3d 409, 420 (2d Cir. 2013); see also Kessler v. Colvin, 48
F. Supp. 3d 578, 595 (S.D.N.Y. 2014) ("A federal court must
afford great deference to the ALJ's credibility finding, since
the ALJ had the opportunity to observe the claimant's demeanor

while the claimant was testifying." (citation and internal quotation marks omitted)); Pietrunti v. Dir., Office of Workers' Comp. Programs, 119 F.3d 1035, 1042 (2d Cir. 1997) ("Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are patently unreasonable." (citation and internal quotation marks omitted)).

It is important to note that in reviewing the ALJ's decision, this Court's role is not to start from scratch. "In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012). **"[W]hether there is substantial evidence supporting the appellant's view is not the question here; rather, we must decide whether substantial evidence supports the ALJ's decision**." Bonet ex rel. T.B. v. Colvin, 523 F. App'x 58, 59 (2d Cir. 2013).

## III. **SSA LEGAL STANDARD**

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. 42 U.S.C. §423(a)(1).

To be considered disabled under the Act and therefore entitled to benefits, plaintiff must demonstrate that she is unable to work after a date specified "by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Such impairment or impairments must be "of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); see also 20 C.F.R. §404.1520(c) (requiring that the impairment "significantly limit[] ... physical or mental ability to do basic work activities[]" to be considered "severe").[4]

There is a familiar five-step analysis used to determine if a person is disabled. See 20 C.F.R. §404.1520. In the Second Circuit, the test is described as follows:

_____

[4] Some of the Regulations cited in this decision, particularly those applicable to the review of medical source evidence, were amended effective March 27, 2017. Those "new regulations apply only to claims filed on or after March 27, 2017." Smith v. Comm'r, 731 F. App'x 28, 30 n.1 (2d Cir. 2018) (summary order). Where a plaintiff's claim for benefits was filed prior to March 27, 2017, "the Court reviews the ALJ's decision under the earlier regulations[.]" Rodriguez v. Colvin, No. 3:15CV1723(DFM), 2018 WL 4204436, at *4 n.6 (D. Conn. Sept. 4, 2018); White v. Comm'r, No. 17CV4524(JS), 2018 WL 4783974, at *4 (E.D.N.Y. Sept. 30, 2018) ("While the Act was amended effective March 27, 2017, the Court reviews the ALJ's decision under the earlier regulations because the Plaintiff's application was filed before the new regulations went into effect." (citation omitted)).

6

First, the Secretary considers whether the claimant is
currently engaged in substantial gainful activity. If
[she] is not, the Secretary next considers whether the
claimant has a "severe impairment" which significantly
limits [her] physical or mental ability to do basic work
activities. If the claimant suffers such an impairment,
the third inquiry is whether, based solely on medical
evidence, the claimant has an impairment which is listed
in Appendix 1 of the regulations. If the claimant has
such an impairment, the Secretary will consider [her]
disabled without considering vocational factors such as
age, education, and work experience; the Secretary
presumes that a claimant who is afflicted with a "listed"
impairment is unable to perform substantial gainful
activity.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per

curiam). If and only if the claimant does not have a listed

impairment, the Commissioner engages in the fourth and fifth

steps:

Assuming the claimant does not have a listed impairment,
the fourth inquiry is whether, despite the claimant's
severe impairment, [she] has the residual functional
capacity to perform [her] past work. Finally, if the
claimant is unable to perform [her] past work, the
Secretary then determines whether there is other work
which the claimant could perform. Under the cases
previously discussed, the claimant bears the burden of
proof as to the first four steps, while the Secretary
must prove the final one.

Id.

"Through the fourth step, the claimant carries the burdens

of production and persuasion, but if the analysis proceeds to

the fifth step, there is a limited shift in the burden of proof

and the Commissioner is obligated to demonstrate that jobs exist

in the national or local economies that the claimant can perform

given [her] residual functional capacity." Gonzalez ex rel.

7

Guzman v. Dep't of Health and Human Serv., 360 F. App'x 240, 243
(2d Cir. 2010) (citing 68 Fed. Reg. 51155 (Aug. 26, 2003));
Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per
curiam)). "Residual functional capacity" ("RFC") is what a
person is still capable of doing despite limitations resulting
from her physical and mental impairments. See 20 C.F.R.
§404.1545(a)(1).

"In assessing disability, factors to be considered are (1)
the objective medical facts; (2) diagnoses or medical opinions
based on such facts; (3) subjective evidence of pain or
disability testified to by the claimant or others; and (4) the
claimant's educational background, age, and work experience."
Bastien v. Califano, 572 F.2d 908, 912 (2d Cir. 1978).
"[E]ligibility for benefits is to be determined in light of the
fact that the Social Security Act is a remedial statute to be
broadly construed and liberally applied." Id. (citation and
internal quotation marks omitted).

## II.  THE ALJ'S Decision

Following the above-described five-step evaluation process,
the ALJ concluded that plaintiff was not disabled under the Act.
See Tr. 35. At step one, the ALJ found that plaintiff had not
engaged in substantial gainful activity since the application

8

date.[5] See Tr. 23. At step two, the ALJ found that plaintiff had the severe impairments of "affective disorder and learning disorder[.]" Tr. 23. The ALJ expressly concluded that plaintiff's impairments of obesity, vertigo, syncope, bulimia nervosa in remission, and alcohol abuse in remission, were non-severe. See Tr. 23-24.

At step three, the ALJ found that plaintiff's impairments, either alone or in combination, did not meet or medically equal the severity of any of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. See Tr. 24. The ALJ specifically considered the paragraph B and paragraph C criteria of Listings 12.02 (neurocognitive disorders) and 12.04 (bipolar and related disorders). See Tr. 24-25. Before moving on to step four, the ALJ found plaintiff had the RFC

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to performing routine, repetitive work, requiring her to understand and remember only simple instructions and carry out only simple tasks. The claimant can only work in an environment involving minimal changes, minimal decision-making, and minimal use of judged [sic]. She can only have occasional interaction with coworkers, supervisors, and the public.

Tr. 26.

---

[5] As noted, the ALJ used February 24, 2014, as the application date; the record reflects an application date of March 11, 2014. See Tr. 23, 297-305. This discrepancy has no impact on the Court's decision.

At step four, the ALJ concluded that plaintiff had no past relevant work. See Tr. 33. At step five, after considering the testimony of the VE as well as plaintiff's age, education, work experience, and RFC, the ALJ found that plaintiff is "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." See Tr. 34.

## III. **Discussion**

Plaintiff seeks reversal or remand for consideration of:

1. Dr. Kaplan's February 8, 2018, report, covering treatment of plaintiff from October 31, 2017, to February 8, 2018, submitted after the Appeals Council issued its ruling, see Doc. #25-1 at 4-9; and

2. A report from the Bureau of Rehabilitation Services, dated March 2, 2017, which the Appeals Council determined did not relate to the period under consideration by the ALJ, see id. at 9-11.

Plaintiff further asserts that the ALJ committed the following reversible errors:

1. The ALJ failed to consider Listing 12.05(C) (intellectual disorder) at step three, see id. at 11-16;

2. The ALJ failed to discuss the paragraph A or paragraph C criteria of Listings 12.02 and 12.04, see id. at 16-17;

3. The ALJ incorrectly evaluated the paragraph B criteria of Listings 12.02 and 12.04 at step three, which, if plaintiff met, might also entitle plaintiff to benefits under paragraph D of Listing 12.05, see id. at 16-17, 25-32; and

4. The ALJ incorrectly weighed the testimony of both plaintiff and Ms. Montagano, see id. at 17-25, 32-35.

Because the Court finds that the ALJ did not apply the correct legal standard to evaluation of plaintiff's IQ scores, and should have expressly evaluated plaintiff's application under Listing 12.05, the Court finds that remand is necessary. The Court does not address plaintiff's remaining arguments. On remand, the ALJ shall expressly consider plaintiff's IQ scores in his evaluation of medical evidence, and consider whether plaintiff meets Listing 12.05. The Court offers no opinion on whether plaintiff should be found disabled on remand, or whether proper evaluation of plaintiff's IQ scores will result in changes to the substance of the ALJ's conclusions with respect to Listings 12.02 and 12.04, or plaintiff's RFC.

**A. Plaintiff's IQ Scores**

The Court begins with a discussion of how the ALJ assessed plaintiff's two Wechsler Adult Intelligence Scale-Form IV ("WAIS-IV") IQ tests and resulting scores.[6] Under various subsections of Listing 12.05, an individual may be entitled to an "irrebuttable presumption of disability[,]" DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998), if, inter alia, the claimant has a "valid verbal, performance, or full scale IQ"

---

[6] The Wechsler series of IQ tests are an acceptable form of IQ testing for the purposes of determining if an individual meets a listing. See 20 C.F.R. § Pt. 404, Subpt. P, App. 1 §12.00(C)(6)(c).

of 70 or lower, 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.05.

On July 12, 2012, plaintiff underwent a psychological evaluation completed by Dr. Anthony F. Campagna, Ph.D. See Tr. 440. Dr. Campagna administered a WAIS-IV test to plaintiff, and summarized the results as follows:

> Her relatively strong verbal expressive skills contributed to her highest composite score on the Verbal Comprehension Index (74). She earned scores in the defective and borderline range on other composite measures. She earned a Working Memory score of 66 and a Processing Speed score of 62. She earned a score of 60 on both the Perceptual Reasoning Index and the Full Scale IQ score. The intellectual subtest results reinforce the impression of a specific deficiency in neurological structures underlying spatial orientation and motor organization.

Tr. 442 (emphasis added).

A Perceptual Reasoning Index IQ ("PRI IQ") score is a performance IQ score. See WAIS-IV Administration and Scoring Manual, David Wechsler 5 (Pearson 2008). The term "performance IQ," which appeared in the WAIS-III, was replaced with the term "Perceptual Reasoning Index" in the WAIS-IV. See id.

On January 14th and 22nd, 2016, Dr. Steven Brown, Psy.D, ABPP, administered another WAIS-IV test to plaintiff.[7] He summarized the results of that testing as follows:

---

[7] The ALJ stated that the examination took place on February 10, 2016. See Tr. 28. While the report was signed by Dr. Brown on that date, the report specified that the examination itself took place in January. See Tr. 857, 860.

Assessment of intelleotual [sic] functioning with the WAIS-IV produced a composite summary score in the "extremely low" range; however, this does not capture her overall intellectual functioning given the significant subtest variability noted. When underlying factors are examined, verbal comprehension subtest scores ranged from borderline to low average (VCI=81, 10th percentile), while nonverbal/visuospacial subtest scores were consistently in the "extremely low" range (PRI=54, &lt [sic]; 1st percentile). Auditory working memory and processing speed subtest scores were "extremely low" as well (WMI=69, 2nd percentile, PSI=62, 1st percentile, respectively). Overall, these findings suggest a significant discrepancy between generally low average verbal intellectual functioning and significantly impaired non-verbal/perceptual reasoning.

Tr. 858 (emphases added). While Dr. Brown's report does not contain a specific full scale or "composite summary score[,]" the Court notes that "extremely low" corresponds to a score of 69 or lower, and that such categorization is consistent with Dr. Brown's descriptions of other scores in his report. Id.; see also Elizabeth O. Lichtenberger & Alan S. Kaufman, Essentials of WAIS-IV Assessment 151 (John Wiley & Sons, Inc. 2009). Dr. Brown also stated: "While the patient's Full Scale IQ (FSIQ) is in a range that would raise question[s] of intellectual disability, the FSIQ actually underestimates her overall intellectual and adaptive capacity." Tr. 859.

To summarize, the record documents PRI IQ scores for plaintiff of 60 and 54, see Tr. 442, 858, and full scale IQ scores of 60 and "extremely low[,]" which reflects a score of 69 or lower, Tr. 858; see also Tr. 442; Lichtenberger, supra.

13

**B. The ALJ's Evaluation of Plaintiff's IQ Scores**

Plaintiff argues: "The Commissioner dismissed or rejected Dr. Campagna's IQ findings or 'subaverage intelligence' and report 'because it was produced before the application date.'"[8] Doc. #25-1 at 12 (sic) (purportedly quoting Tr. 32-33) (emphasis omitted). The Commissioner asserts that the ALJ disregarded plaintiff's full scale IQ score of 60, as calculated by Dr. Campagna, in reliance on Dr. Brown's suggestion that plaintiff's intelligence was higher than indicated by her full scale IQ score. See Doc. #25 at 13-14; Doc. #29-1 at 12-13; Tr. 859. However, the parties disagree regarding whether that was appropriate.

Neither party specifically addresses the handling of plaintiff's PRI IQ scores, nor the full scale score of

_____

[8] The Court notes that the purportedly quoted language does not accurately reflect the words used by the ALJ. More importantly, counsel's combination of two quotations creates an inaccurate summary of the ALJ's analysis. The ALJ actually stated: "Dr. Campagna concluded that there was evidence of sub-average intellectual functioning ... [and] that the claimant's combination of anxiety-related affective and intellectual difficulties might markedly reduce her ability to engage in all age-appropriate interpersonal relationships and markedly reduce the speed and concentration with which she performs even the simplest tasks[.]" Tr. 32-33. The ALJ proceeded to give "Dr. Campagna's consultative examination [] little weight, as it is inconsistent with the medical evidence of record, but his GAF score of 55 is given partial weight. ... <u>Dr. Campagana's GAF score</u> is more consistent with the medical records listed above, <u>but is not given great weight, as it was produced before the application date</u>[.]" Tr. 33 (emphases added).

"extremely low," referenced in Dr. Brown's report; the parties expressly address only plaintiff's full scale IQ score of 60.

The ALJ considered both Dr. Brown's 2016 report and Dr. Campagna's 2012 report when discussing plaintiff's residual functional capacity, but his decision does not specifically reference any of her IQ scores. See Tr. 29, 32-33. The ALJ did not expressly assign weight to Dr. Brown's 2016 opinion, as he did to other medical evidence. However, the ALJ clearly considered and placed weight on this report, because his decision repeatedly devalues other pieces of evidence, including Dr. Campagna's 2012 report, as inconsistent with the record because: "A neuropsychological examination in February of 2016 demonstrated that the claimant's results were generally within the normal limits on measured [sic] of verbal intelligence, language, verbal learning, and recent memory (See Ex. 11F)."[9] Tr. 31-33. The ALJ assigned "little weight" to all of Dr. Campagna's report except for the GAF score, which was assigned "partial weight". Tr. 33.

Plaintiff argues that "neither Dr. Brown's findings nor Dr. Campagna's results may be discredited or assigned weight as if they were merely medical opinions. The findings on the Wechsler

---

[9] This sentence appears four times in three pages of the ALJ's decision. See Tr. 31-33. Dr. Brown's 2016 report is contained in the document which was designated Exhibit 11F in the administrative proceedings below. See Tr. 857-860.

Adult Intelligence Scale, IQ testing, is considered a 'laboratory finding.'" Doc. #25-1 at 15 (citations omitted). The Commissioner offers no response to this specific argument.

The Court agrees with plaintiff. "Psychological testing is considered laboratory findings, because the tests are anatomical, physiological, or psychological phenomena which can be shown by the use of [] medically acceptable laboratory diagnostic techniques. By their very nature, IQ results are not statements from doctors, reflecting their judgment; instead IQ scores result from a claimant's performance on a standardized test." Rivera v. Colvin, No. 3:15CV01701(VLB), 2017 WL 1005766, at *5 (D. Conn. Mar. 15, 2017) (citations and quotation marks omitted). An ALJ may properly reject an IQ score when he finds that it is "invalid[,]" such as when an individual score is inconsistent with the record, or when multiple tests produce significant variation in the same score. Miller v. Astrue, No. 3:07CV01093(LEK), 2009 WL 2568571, at *7 (N.D.N.Y. Aug. 19, 2009) (collecting sources). However, an ALJ commits potentially reversible error when he discounts or weighs IQ scores as though they were merely medical opinion as opposed to laboratory findings. See Rivera, 2017 WL 1005766, at *5.[10]

_____

[10] The Court notes that, under current SSA regulations, as opposed to the governing regulations at the time of plaintiff's application for benefits, an ALJ has less discretion to discount

The ALJ did not specifically discuss plaintiff's IQ scores; therefore, he did not expressly determine that any particular score was valid or not valid. Rather, the ALJ discussed Dr. Brown and Dr. Campagna's reports only in the context of weighing medical opinions. The ALJ's treatment of plaintiff's IQ scores, and these reports, raises broad concerns, impacting the ALJ's analysis at every step of the evaluation process. Had the ALJ acknowledged and properly evaluated plaintiff's IQ scores, and the reports discussing those scores, the ALJ might have evaluated other pieces of medical evidence differently. Proper evaluation of IQ scores is particularly important in a case like this, where nearly all of the evidence and evaluation centers on plaintiff's mental capacity.

Additionally, with respect to operative scores for the purposes of Listing 12.05, even if the Court were to find that the ALJ -- implicitly -- properly rejected both of plaintiff's full scale IQ scores based on Dr. Brown's commentary regarding plaintiff's overall intelligence,[11] nothing in the ALJ's decision

_____

an IQ score, as the regulation no longer contains the modifier "valid[.]" See Rivera, 2017 WL 1005766, at *5.

[11] As noted above, the ALJ did not actually reject any of plaintiff's IQ scores. The Court also notes that Dr. Brown determined that the IQ scores discussed in his own report were "valid[,]" although he expressed some concern regarding how reflective (or not) those scores were of plaintiff's functional abilities. Tr. 858; see Tr. 859.

or the record gives the Court any basis to determine that plaintiff's PRI IQ scores of 60 and 54 were rejected or even called into question by any physician or the ALJ. Accordingly, the Court proceeds in its analysis, assuming without deciding that plaintiff has one valid IQ score of 59 or lower, and at least one valid IQ score between 60 and 70, as relevant to the consideration of Listing 12.05.

### C. Listing 12.05

Plaintiff argues that she meets subsections C and D of Listing 12.05, and that the ALJ's failure to consider Listing 12.05 was error. See Doc. #25-1 at 11-6. If plaintiff meets this, or any, listing, she would be entitled to an "irrebuttable presumption of disability." DeChirico, 134 F.3d at 1180. The Commissioner argues that no specific diagnosis of an intellectual disability, as opposed to a learning disorder, has been made, so the ALJ was correct not to evaluate plaintiff under Listing 12.05. See Doc. #29-1 at 12. The Commissioner does not provide any authority to support the contention that a claimant who meets all the criteria set forth in a listing cannot be found disabled at step three without a specific diagnosis of intellectual disability. Additionally, the Court notes that the ALJ repeatedly referenced plaintiff's intellectual functioning in his decision, see Tr. 29, 32, which further supports plaintiff's claim that the ALJ should have

18

discussed Listing 12.05, even if he ultimately would have concluded that plaintiff did not meet the listing.[12]

Listing 12.05 requires that plaintiff demonstrate separately that she suffers from (1) "significantly subaverage general intellectual functioning" and (2) "deficits in adaptive functioning ... [which] arise from her cognitive limitations, rather than from a physical ailment or other infirmity." Talavera v. Astrue, 697 F.3d 145, 153 (2d Cir. 2012) (citations and quotation marks omitted); see also Bushey, 739 F. App'x at 672. Each element must have "initially manifested before age 22." Talavera, 697 F.3d at 153 (citations and quotation marks omitted). Because individuals "experience a fairly consistent IQ throughout their lives[,]" a low IQ score as an adult establishes a prima facie case of "significantly subaverage general intellectual functioning" before the age of 22. Talavera, 697 F.3d at 152 (citations and quotation marks omitted).

---

[12] Furthermore, "it is self-evident that courts should exercise an extra measure of caution when adjudicating the claims of a litigant whose mental capacity is in question. In such cases, the individual is not only less able to participate in the proceedings, but also less able to monitor his or her counsel's performance." Chapman v. ChoiceCare Long Island Term Disability Plan, 288 F.3d 506, 514 (2d Cir. 2002) (citations omitted). The ALJ should not have taken such a narrow approach to his evaluation, given that plaintiff's mental capacity was a central inquiry of the hearing.

### 1. Significantly Subaverage General Intellectual Functioning

Listing 12.05 states:

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
...
B. A valid verbal, performance, or full scale IQ of 59 or less; OR

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; OR

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.05. Plaintiff argues that the ALJ should have evaluated her application under subsections C and D, relying on her full scale IQ score of 60. See Doc. #25-1 at 11-36.

Before turning to plaintiff's arguments regarding subsections C and D, the Court pauses to discuss subsection B, which plaintiff does not address in her motion. Dr. Brown found a PRI IQ score of 54. See Tr. 858. As noted above, a PRI IQ score is a performance IQ score. "In cases where more than one IQ is customarily derived from the test administered, e.g.,

where verbal, performance, and full scale IQs are provided in the Wechsler series, <u>we use the lowest</u> of these in conjunction with 12.05." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 §12.00(C)(6)(c) (emphasis added). Therefore, plaintiff's PRI IQ score of 54 is a potentially operative score for the purposes of Listing 12.05.[13] If the ALJ determines that plaintiff has sufficient deficits in adaptive functioning, discussed below, she may qualify for benefits under Listing 12.05(B) without making <u>any</u> further showing. On remand, the ALJ shall expressly consider plaintiff's eligibility for benefits based on Listing 12.05(B).

As plaintiff received only one IQ score below 60, and the ALJ has yet to provide a proper evaluation of plaintiff's IQ scores, in an abundance of caution, the Court will briefly address plaintiff's arguments regarding sublistings C and D of Listing 12.05. As to Listing 12.05(C), because the ALJ did not evaluate plaintiff under this listing, the Court is not in a position to determine whether plaintiff's <u>other</u> impairments impose "an additional and significant work-related limitation of

---

[13] As noted above, Dr. Brown's report indicated that plaintiff's intelligence may not be accurately reflected by her "Full Scale IQ[.]" Tr. 859. However, neither the parties nor the ALJ point to <u>any</u> evidence that would call this performance IQ score into question.

function[.]" 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.05(C).

The ALJ concluded that plaintiff has the severe impairments of "affective disorder and learning disorder[.]" Tr. 23. On remand, the ALJ shall not be limited to his original findings at step 2, and should reevaluate plaintiff's severe impairments, taking plaintiff's IQ scores into proper consideration. If plaintiff is not found to be disabled at an earlier stage, the ALJ shall consider on remand whether any severe impairment, or any of plaintiff's other conditions, such as anxiety, depression, or poor fine motor control, which were all referenced in the ALJ's decision, see Tr. 26, 29, independently create "significant work-related limitation of function[.]" 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.05(C).

Finally, if plaintiff is not found to be disabled at an earlier stage, the ALJ shall also reevaluate the paragraph B criteria of Listings 12.02 and 12.04, which are also the relevant criteria associated with 12.05(D).[14] While the ALJ did

---

[14] Those criteria require a claimant to have at least two of the following:
>    1. Marked restriction of activities of daily living; or
>    2. Marked difficulties in maintaining social functioning; or
>    3. Marked difficulties in maintaining concentration, persistence, or pace; or
>    4. Repeated episodes of decompensation, each of extended duration.

evaluate these criteria in his original decision, <u>see</u> Tr. 25,
proper consideration of plaintiff's IQ scores may impact the way
in which the ALJ evaluates the medical evidence he used to reach
those conclusions. The Court offers no opinion on whether the
ALJ's findings or decisions regarding these criteria will or
should change on remand.

### 2. Deficits in Adaptive Functioning

Listing 12.05 also requires that a claimant demonstrate a
deficit in adaptive functioning:

> Adaptive functioning refers to an individual's ability
> to cope with the challenges of ordinary everyday life.
> Accordingly, courts have held that if one is able to
> satisfactorily navigate activities such as living on
> one's own, taking care of children without help
> sufficiently well that they have not been adjudged
> neglected, paying bills, and avoiding eviction, one does
> not suffer from deficits in adaptive functioning.

<u>Talavera</u>, 697 F.3d at 153. The Second Circuit has upheld a
determination that a claimant did <u>not</u> have a deficit in adaptive
functioning where the individual

> reported graduating from high school without special
> education classes, maintaining a job for some time after
> high school, and briefly attending college.
> Additionally, although she reported <u>sometimes</u> needing
> help with cooking, cleaning, and laundry, she [had]
> nevertheless been able to live alone, obtain a driver's
> license, take public transportation, shop for food, and
> pay her bills.

---

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listings 12.02(B),
12.04(B), and 12.05(D). The ALJ concluded that plaintiff had
only "moderate" difficulties or restrictions in the first
three categories, and no episodes of decompensation that
would meet the fourth category. Tr. 24-25.

Burnette v. Colvin, 564 F. App'x 605, 607–08 (2d Cir. 2014)
(emphasis added). Other abilities that indicate an individual
does not have deficits in adaptive functioning include the
"ability to navigate public transportation without assistance,
engage in productive social relationships, and manage [one's]
own personal finances[.]" Talavera, 697 F.3d at 154.

Here, the Court has insufficient information to determine
whether the ALJ found, even implicitly, that plaintiff met or
did not meet this element of Listing 12.05. The ALJ concluded
that plaintiff had "moderate restrictions" in both activities of
daily living and social functioning, suggesting some deficit in
adaptive functioning. Tr. 24-25.

Plaintiff did not complete high school, was in a special
education program throughout her schooling, and has always lived
with her mother or her aunt. See Tr. 30, 141-142, 857. Plaintiff
is "uninformed about certain aspects of adult life[,]" and
relies on her aunt for "things like handling her mail[]" and
filling out forms. Tr. 26, 28. Plaintiff's aunt and physicians
have expressed concern regarding her ability to appropriately
and safely develop social and romantic relationships. See Tr.
497, 178-179. The ALJ stated that plaintiff was capable of
helping her aunt with tasks like "doing the dishes, dusting,
taking out the trash, and vacuuming" and "prepar[ing] meals."

Tr. 26. Plaintiff "has to be shown how to do things, like set the table and wash the dishes." Id. Plaintiff has made repeated, but ultimately unsuccessful, attempts to obtain her GED. See Tr. 857. The ALJ concluded that plaintiff requires help to pay bills, and has trouble counting or calculating change in financial transactions. See Tr. 27, 141-142. As the Commissioner acknowledges in her motion, plaintiff has "difficulty counting change, managing her finances, and need[s] assistance in shopping." Doc. #29-1 at 17.

Conversely, plaintiff represented to Dr. Brown that she was "independent in all basic activities of daily living." Tr. 857. Records from Cornell Scott-Hill Health Center also indicate that plaintiff had previously been able to provide some care to her ailing mother. See Tr. 494. Plaintiff has some ability to get around using public transportation. See Tr. 24. The ALJ stated that plaintiff "has been learning how to live independently." Tr. 31-33.

While the ALJ stated that plaintiff "has been able to function normally, despite her alleged impairments[,]" he went on to discuss the ways in which plaintiff and her aunt are able to cohabitate. Tr. 29-30. The fact that plaintiff resides with a supportive relative may alleviate the practical impacts of any potential deficits in her own adaptive functioning, but it does not necessarily mean that no such deficits exist.

The ALJ discussed plaintiff's everyday functioning in reference to how she and her aunt work together. However, under Listing 12.05, it is <u>plaintiff's</u> alleged deficits in adaptive functioning which must be evaluated, not the alleged deficits of her support network collectively. On the other hand, the fact that plaintiff's aunt regularly completes specific chores does not necessarily mean that plaintiff lacks the "ability to cope with the challenges of" that task. <u>Talavera</u>, 697 F.3d at 153. On remand, the ALJ shall expressly consider whether <u>plaintiff</u> has deficits in adaptive functioning.

**IV.  <u>Conclusion</u>**

Plaintiff's full scale IQ scores of 60 and "extremely low[,]" <u>see</u> Tr. 442, 858, and PRI IQ scores of 60 and 54, <u>see id.</u>, should have triggered express review under Listing 12.05 by the ALJ where, as here, neither the record nor the ALJ's decision provides a clear answer as to whether plaintiff suffers from deficits in adaptive functioning. The ALJ committed error when he did not expressly address that listing in his decision.

"[W]here application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration[,]" <u>Johnson v. Bowen</u>, 817 F.2d 983, 986 (2d Cir. 1987), but that is not the case here. Because "the Court cannot conclude that application of Listing 12.05[] to the evidence in the record could lead to only one conclusion,

i.e., a finding of no disability, as the record contains some evidence that [plaintiff] met the criteria for that listing[,]" remand is required. Perkins v. Berryhill, No. 3:17CV00200(MPS), 2018 WL 3344227, at *4 (D. Conn. July 9, 2018).

On remand, the ALJ shall conduct a new, full hearing on plaintiff's application, expressly considering Listing 12.05. The ALJ shall not be limited to discussion only of that listing, or by any of his prior findings.

The ALJ shall also specifically discuss plaintiff's full scale and PRI IQ scores in his evaluation of medical evidence at all relevant steps. The Court does not reach the merits of plaintiff's remaining arguments. On remand the Commissioner shall address the other claims of error not resolved herein. The Court offers no opinion on whether the ALJ should or will find plaintiff disabled on remand.

For the reasons set forth herein, plaintiff's Motion to Reverse or Remand **[Doc. #25]** is **GRANTED**, to the extent that it seeks remand for further proceedings, and defendant's Motion for an Order Affirming the Decision of the Commissioner **[Doc. #29]** is **DENIED.**

SO ORDERED at New Haven, Connecticut, this 18th day of March, 2019.

/s/
————————————
HON. SARAH A. L. MERRIAM
UNITED STATES MAGISTRATE JUDGE
